IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Pamela Colleen Pear,　　　　　　　　) | Civil Action No. 6:18-2307-BHH-KFM |
| 　　　　　　　　Plaintiff,　　　) | |
| 　　　　　　　　　　　　　　　) | **REPORT OF MAGISTRATE JUDGE** |
| 　　vs.　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　) | |
| Andrew M. Saul,　　　　　　　　) | |
| Commissioner of Social Security,　) | |
| 　　　　　　　　　　　　　　　) | |
| 　　　　　　　　Defendant.　　) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1] The plaintiff brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff protectively filed an application for supplemental security income ("SSI") benefits on August 21, 2014, alleging disability commencing August 1, 2014. The application was denied initially and on reconsideration by the Social Security Administration. On July 29, 2015, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Dawn Bergren, an impartial vocational expert, appeared during a hearing on February 15, 2017, considered the case de novo, and on August 16, 2017, found that the plaintiff was not under a disability as defined in the Social Security Act,

---

[1] A report and recommendation is being filed in this case in which one or both parties declined to consent to disposition by the magistrate judge.

as amended (Tr. 18-28). The ALJ's finding became the final decision of the Commissioner

of Social Security when the Appeals Council denied the plaintiff's request for review on July

28, 2018 (Tr. 1-5). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the

Commissioner has adopted the following findings of the ALJ:

> (1)     The claimant has not engaged in substantial gainful activity since August 21, 2014, the application date (20 C.F.R. § 416.971 *et seq.*)
>
> (2)     The claimant has the following severe impairments: cerebrovascular accident (CVA), a history of deep vein thrombosis (DVT), and Factor C coagulation disorder (20 C.F.R. § 416.920(c)).
>
> (3)     The claimant does not have an impairment or combination of impairments that meets or medically equals the the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).
>
> (4)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except the claimant would need to alternate between sitting and standing every 30 minutes, provided she is not off task. She could never operate foot controls with her right leg; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance on flat, dry, and level surfaces, but never on wet or uneven surfaces. She would need to utilize both hands to handle objects greater than 10 pounds. She should never be exposed to open, moving, mechanical parts or hazardous machinery and never be exposed to unprotected heights. She can read ordinary newspaper or book print and avoid normal hazards in the workplace. She would be absent from work 1 day per month.
>
> (5)     The claimant is unable to perform any past relevant work (20 C.F.R. § 416.965).
>
> (6)     The claimant was born on January 2, 1967, and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant

subsequently changed age category to closely approaching advanced age (20 C.F.R. § 416.963).

(7)     The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

(8)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(9)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers  in the national economy that the claimant can perform (20 C.F.R. § 416.969, 416.969(a)).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since August 21, 2014, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

Under 42 U.S.C. § 1382c(a)(3)(A), (H)(i), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that meets

3

or medically equals an impairment contained in the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, (4) can perform his past relevant work, and (5) can perform other work. *Id.* § 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 416.920(a)(4).

A claimant must make a *prima facie* case of disability by showing he is unable to return to his past relevant work because of his impairments. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). Once an individual has established a *prima facie* case of disability, the burden shifts to the Commissioner to establish that the plaintiff can perform alternative work and that such work exists in the national economy. *Id.* (citing 42 U.S.C. § 423(d)(2)(A)). The Commissioner may carry this burden by obtaining testimony from a vocational expert. *Id.* at 192.

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* Consequently, even if the court disagrees with Commissioner's decision, the court must uphold it if it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born on January 2, 1967, and was 47 years old on the date the application was filed (August 21, 2014) and 50 years old on the date of the ALJ's

decision (August 16, 2017).  She attended school through the eleventh grade and has past relevant work as a kitchen helper, short order clerk, and waitress (Tr. 80,190).

On August 20, 2014, the plaintiff presented to Nason Medical Center with left leg swelling and knee pain for two days.  Her blood pressure was 133/82.  She had tenderness with mild edema to the medial aspect of the mid left thigh extending to the popliteal fossa.  She was assessed with left leg pain and swelling and deep vein thrombosis ("DVT").  She had an ultrasound that was positive for DVT.  She was referred to Gordon Thompson, M.D. (Tr. 257-78).

On August 28, 2014, the plaintiff was prescribed Lovenox and warfarin for DVT at Palmetto Primary Care (Tr. 381-82).

The plaintiff was admitted to Trident Medical Center on September 7 through 9, 2014.  She was found to have had a stroke after she presented with left-sided facial droop and weakness.  An MRI confirmed a right lacunar ischemic infarct.  She underwent CT angiography of head and neck, carotid doppler, and echocardiogram, which showed no acute sources of clot.  Home health physical therapy was recommended. Discharge diagnoses were acute cerebral vascular accident ("CVA"), diabetes mellitus, DVT, uncontrolled hypertension, and hyperlipidemia.  At discharge, she continued to have 4/5 residual left-sided weakness and facial droop but overall improvement.  The discharging physician recommended she follow up with outpatient medical appointments and comply with her medication regimen.  He also recommended she exercise, quit smoking, and limit caffeine intake.  Within a week, hospital physicians described her CVA as resolved (Tr. 285-90, 314-15, 331-37, 365, 484).

In a function report dated September 15, 2014, the plaintiff described her daily activities as caring for her medical needs, eating breakfast, cleaning, and straightening the house if she was expecting company.  Although she claimed she needed assistance with personal care, she could prepare simple and multi-course meals.  She could mow her lawn,

but it tired her out.  She cleaned every other day, did her laundry on the weekends, and mowed the lawn with assistance every other weekend.  The plaintiff shopped in stores for clothing for herself and for her children and for personal items.  Her hobbies included watching television, sewing, and fixing her children's hair if her hands were not painful.  The plaintiff's social activities included talking on the telephone and walking to a friend's house to visit about once a week.  She did not indicate that she used a cane (Tr. 204-11).

On October 13, 2014, the plaintiff reported to Dr. Thompson that she had balance issues and pain in her left leg from DVT.  Disability paperwork was completed for short term disability due to pain in her leg.  Dr. Thompson noted that the paperwork asked if the condition was permanent, to which he replied that it was short term.  She had pain with prolonged standing but was encouraged to become "MORE active."  On examination, she had decreased pulse in left foot and a potential pre-ulcerative callous on her heel.  Dr. Thompson assessed improving DVT, pain in limb, and new peripheral vascular disease (Tr. 362-63).

On January 7, 2015, at the state agency's request, Adebola Rojugbokan, M.D., evaluated the plaintiff in a consultative neurological examination.  The plaintiff had an acute stroke and complained of residual weakness and falls.  She reported she was unable to work due to weakness on one side of the body and could not perform the kind of work she used to do.  Her blood pressure was 150/90.  She walked with a slightly antalgic gait with a limp favoring the right leg.  She had normal ability to use her hands and arms with grip strength of 4/5 on the right and 5/5 on the left.  Sensation was intact but decreased on the right side.  She had slight muscular weakness on the right lower extremity about 4/5, and 5/5 strength in the left lower extremity.  She had difficulty tandem walking but was able to perform heel-to-shin with the left but was abnormal on the right. Finger to nose movement was slightly diminished on the right.  Overall, the plaintiff's physical examination was normal on the left side but slightly abnormal on the right side.   Dr. Rojugbokan

6

observed that the plaintiff did not use an assistive device for ambulating.  Dr. Rojugbokan assessed DVT, insulin-dependent diabetes, high blood pressure, hyperlipidemia, and history of stroke with right-sided weakness.  She also smoked.  Dr. Rojugbokan stated that the plaintiff had no problems sitting, was able to stand for about ten to 15 minutes, and had difficulty lifting or carrying any object with the right hand (Tr. 342-45).

On January 15, 2015**,** the plaintiff was evaluated by Timothy Beatty, D.O.,  at Trident Medical Center for lightheadedness that had lasted three days.  She reported chronic balance problems and high blood pressure.  She was on Xarelto and had recently started hypertensive medications.  Her blood pressure was 188/110.  The plaintiff had normal extremities, normal back, intact cranial nerves, normal speech, and no motor or sensory deficits.  The plaintiff's glucose was 307.  Due to a history of a headache and dizziness, a CT scan of her head was ordered that showed a history of a CVA but no acute abnormalities.  She was diagnosed with uncontrolled diabetes mellitus and hypertension (Tr. 421-27).

On January 23, 2015, state agency medical consultant Isabella McCall, M.D., opined that the plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry ten pounds, stand and/or walk for a total of four hours, sit about six hours in an eight-hour day, frequently push and pull with the right upper and lower extremities, and had postural, manipulative, and environmental limitations (Tr. 96-99).

On January 28, 2015, the plaintiff followed up with Dr. Thompson.  On examination, the right arm and leg had globally decreased strength.  She had no neurological focal signs.  She was unable to lift the right arm above her head and had poor grip strength.  Dr. Thompson noted that she was not following her diet for her glucose levels and was not monitoring her blood sugars.  In addition, Dr. Thompson noted that the plaintiff's lack of exercise, smoking, and medication non-compliance aggravated her

hypertension. She was also not taking Xarelto for blood clots. She was referred to physical therapy for her right arm and leg (Tr. 356-58).

On March 17, 2015, the plaintiff saw Dr. Thompson for followup. She stated that her CVA was resolved and improving. She further reported that she could not perform physical activity for over two hours at a time and that she had recently quit smoking. Dr. Thompson referred the plaintiff to a pulmonologist (Tr. 351-53). On the same date, Dr. Thompson reported on a physician statement for the South Carolina Department of Social Services ("DSS") that the plaintiff's disability, which included CVA, diabetes, peripheral vascular disease, and DVT, was not permanent, but was expected to last six months. He reported she was unable to work or participate in any activities to prepare for work. She was able to sit, push/pull, keyboard, or lift and carry for four hours per day. She could stand, walk, climb stairs/ladders, knee/squat, or bend/stoop for two hours per day (Tr. 402-05).

On April 5, 2015, Dr. Thompson completed a physician report for family court. He reported that the plaintiff was being treated for CVA, diabetes, peripheral vascular disease, and DVT. He stated she was not able to work at her usual occupation. He considered her to be partially and permanently disabled. He reported she was unable to stand for long periods and had weakness and shortness of breath (Tr. 406).

On April 15, 2015, the plaintiff followed up with Dr. Thompson. She reported continued weakness after CVA and inability to perform physical activity over two hours at a time. On examination, she had right arm and leg decreased strength, poor grip, and inability to lift her right arm above her head. She had normal extremities, a normal back with full range of motion, and a normal gait. Dr. Thompson noted that she was currently partially and likely permanently disabled from her CVA (Tr. 567-69). The plaintiff continued followup with Dr. Thompson through October 2015 for hypertension, diabetes, and hemoptysis (Tr. 535-56).

8

In a function report dated April 19, 2015, the plaintiff reiterated much of her September 2014 function report, but also noted she cared for her two small children. She prepared only simple meals, did not socialize, and was recently prescribed a cane (Tr. 222-28).

On May 15, 2015, state agency medical consultant Stephan Wissman, M.D., opined that the plaintiff could occasionally lift and carry 20 pounds, frequently lift ten pounds, stand and/or walk for a total of six hours and sit about six hours in an eight-hour day, frequently push and pull with the right upper and lower extremities, and had postural, manipulative, and environmental limitations (Tr. 109-112).

On September 29, 2015, the plaintiff saw Dr. Thompson for followup of hypertension.  Dr. Thompson noted that response to medication had been good, but the plaintiff was not at goal. He spent most of the visit counseling the plaintiff as she "had been very non-compliant" (Tr. 543-44).

On November 3, 2015, the plaintiff reported to Dr. Thompson she was not able to sit or stand for long periods or walk long distances.  Residual effects from CVA were poor handwriting, spelling issues, and frequent falls.  She had numbness in the right shoulder and hand. She reported taking Xarelto "every other day or so." He stated that the plaintiff was "currently fully disabled," but he hoped for improvement, "stop smoking compliance with all meds - dm, htn, lipids - a must for any hope of . . . quality of life."  Dr. Thompson also opined on disability forms that the plaintiff was capable physically of attending class to learn a new vocation that did not require standing or great physical effort (Tr. 535-36).

On October 16, 2016, the plaintiff was admitted to Trident Medical Center for left leg numbness and suspected stroke.  She presented with left leg paresthesia and difficulty ambulating for four days that had resolved.  She reported intermittent compliance with medications except Xarelto, which she reported she took diligently. An MRI showed

9

multiple old infarcts presumably due to lipohyalinosis, a cerebral small vessel disease. She had poorly controlled diabetes and hypertension for which medications were adjusted. Her attending physician noted that the plaintiff had "ongoing strokes since her last admission despite reportedly being on Xarelto." Discharge diagnosis was left leg numbness (Tr. 479-83).

On October 20, 2016, the plaintiff followed up with Dr. Thompson for difficulty walking and for DSS paperwork. She reported peripheral neuropathy from poorly controlled diabetes. Dr. Thompson noted poor compliance with hypertension and "poor control" of diabetes. Dr. Thompson "noted multiple times that [the plaintiff] was counseled re: medication compliance and smoking cessation" (Tr. 532).

On November 1, 2016, Dr. Thompson reported the plaintiff still had ataxia and used a cane to walk. She was regularly checking her blood sugars, five times per day, and Dr. Thompson noted that she was "DOING GREAT." She reported losing her balance since her September 2014 CVA, experiencing hand fatigue during fine motor and gripping, and feeling right shoulder and hand numbness and pain. Dr. Thompson noted that the plaintiff still had ataxia and used a can to walk but was "doing much better with her compliance" (Tr. 529). Dr. Thompson observed that the plaintiff had normal musculoskeletal range of motion; normal sensation in her feet; normal strength; normal finger-to-nose testing; and some right upper extremity weakness (Tr. 530).

On November 2, 2016, Dr. Thompson completed another DSS physician statement indicating that the plaintiff's disability was permanent, and she was unable to work or participate in activities to prepare for work. He opined she had the capacity for a maximum of two hours per day to sit, stand, walk, climb stairs/ladders, kneel/squat, bend/stoop, push/pull and lift/carry. He noted that she needed to lay down often and "can't really sit to type" (Tr. 522-23).

10

At the hearing held on February 15, 2017, the plaintiff testified that she had worked in the past at a fast food restaurant as a cook and at a diner-type restaurant where she did both kitchen and janitorial work. She was 50 years old at the time of the hearing. She reported that she had lost about 30 pounds since her health trouble started. She lived with her two of her eight children, ages nine and 11. She did not drive because her license had been revoked. She relied on her brother to take her shopping. She cooked mostly simple, microwave meals for herself and her children, because she could not stand long enough to prepare "an actual meal." Her family helped to pay her rent, for groceries, and for medication. Due to vision problems, she had difficulty reading. She also had difficulty writing since her stroke (Tr. 47-63).

Between 2009 and 2011, the plaintiff stopped working in order to care for her children. In a normal day, the plaintiff would get her children on their way to school, eat breakfast, and get back in bed to sleep or watch television. She tired easily. She admitted that she did not take her medications regularly. She stated she understood that her blood pressure was causing her strokes, but there was a long time over the course of the relevant period where she was not taking her medications. She testified that her failure to take medication was sometimes due to memory and sometimes it was because she relied on other people to take her to the pharmacy. She claimed that her family could not get her medicine for her, or she did not have the funds to pay for it. She testified that her blood pressure medicine cost four dollars. She testified she had quit smoking, and she reported compliance with her diabetes medication (Tr. 67-75). The plaintiff explained that her inability to stay on her feet was a major barrier to working. She stated that she became dizzy easily. She used a cane and a rolling walker for balance (Tr. 77-78).

The vocational expert classified the plaintiff's past relevant work as follows: kitchen helper - medium, unskilled work (heavy as performed by the plaintiff); short order cook - light, semi-skilled work; and waitress - light, semi-skilled work (Tr. 80). The ALJ

described a hypothetical worker of the plaintiff's age, education, and work experience who was limited to light work, but needed to alternate between sitting and standing every 30 minutes, could never operate foot controls with the right leg, could never climb ladders, ropes, or scaffolds, could occasionally climb ramps or stairs, occasionally balance on dry level surfaces, required the use of both hands to lift anything greater than ten pounds, and should never be exposed to hazardous machinery or heights. The worker would also be absent from work one day per month (Tr. 82-83).

The vocational expert testified that this would preclude the plaintiff's past relevant work, but identified other light, unskilled work that accommodated such limitations: small parts assembler (22,000 positions in the United States), electronics worker (10,000 positions in the United States), and laundry folder (98,000 positions in the United States). Due to the limitations in sitting and standing, however, the vocational expert reduced the numbers by 75 percent (Tr. 83). The vocational expert testified that the jobs identified were "bench work," meaning that a stool would likely be available for the worker to sit and stand at will. The need for a cane to ambulate to and from the work station would not impact the jobs discussed. If the worker was limited to lifting a maximum of ten pounds, all light work would be precluded (Tr. 84-85).

The ALJ re-posed her earlier hypothetical, except the worker would be limited to sedentary work. The vocational expert testified that sedentary work would require being seated for 60 minutes at a time, so the need to stand after 30 minutes would preclude sedentary work. If the worker needed to stand for only five minutes per hour, then sedentary work would be available. The vocational expert identified the occupations of order clerk (approximately 19,000 positions), charge account clerk (approximately 16,000 positions), and document preparer (approximately 103,000 positions). The need for one or two additional, scheduled 15 minute breaks per day would not preclude the previously identified sedentary occupations. If the worker was absent two or more days per month,

12

all work would be eliminated. Likewise, if the worker was off-task 15 percent of the day or more, all work would be eliminated. The vocational expert testified that her testimony was consistent with the *Dictionary of Occupational Titles* ("*DOT*") with the exception of the sit/stand option, use of a cane, and off-task behavior, which the vocational expert based on her training, education, and experience in job placement (Tr. 86-89).

## ANALYSIS

The plaintiff argues that the residual functional capacity ("RFC") assessment is not based on substantial evidence, and the ALJ erred by (1) giving only partial weight to the opinion of consultative examiner Dr. Rojugbokan, (2) failing to give proper weight to the opinions of treating physician Dr. Thompson, and (3) failing to properly consider her subjective complaints (doc. 16 at 8-14).

### *Residual Functional Capacity*

The regulations provide that a claimant's RFC is the most that she can still do despite her limitations. 20 C.F.R. § 416.945(a). It is the ALJ's responsibility to make the RFC assessment, *id.* § 416.946(c), and the ALJ does so by considering all of the relevant medical and other evidence in the record, *id.* § 416.945(a)(3).

Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on

> a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Moreover, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

Here, the ALJ found that the plaintiff could perform light work except she would need to alternate between sitting and standing every 30 minutes, provided she is not off task; could never operate foot controls with her right leg; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance on flat, dry, and level surfaces, but never on wet or uneven surfaces; would need to utilize both hands to handle objects greater than ten pounds; should never be exposed to open, moving, mechanical parts, hazardous machinery, and unprotected heights; can read ordinary newspaper or book print and avoid normal hazards in the workplace; and would be absent from work one day per month (Tr. 22). In making the RFC assessment, the ALJ considered the medical evidence, the plaintiff's subjective complaints, and the medical opinion evidence (Tr. 22-26). The ALJ concluded that the plaintiff's impairments were accommodated by this very restrictive RFC assessment (Tr. 24; *see* Tr. 22). As discussed below, the undersigned finds the RFC assessment is based upon substantial evidence and is without legal error. *Craig*, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]").

***Medical Opinions***

The plaintiff argues that the ALJ failed to properly consider the opinions of her treating physician, Dr. Thompson, and the consultative examiner, Dr. Rojugbokan (doc. 16 at 8-14). The regulations require that all medical opinions in a case be considered. 20 C.F.R. § 416.927(b). The regulations further direct ALJs to accord controlling weight to a treating physician's opinion that is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that is not inconsistent with the other substantial evidence of record. *Id.* § 416.927(c)(2). If a treating physician's opinion is not given controlling weight, the ALJ must proceed to weigh the treating physician's opinion, along with all the other medical opinions of record, based upon the following non-exclusive list of factors: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 416.927(c)(1)-(5).[2] *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).

As set out above, Dr. Thompson gave several medical opinions regarding the plaintiff's physical limitations. In October 2014, shortly after the plaintiff's CVA, Dr. Thompson filled out paperwork for short term disability, although the plaintiff's case worker asked that it be permanent (Tr. 362-63). As the ALJ noted, Dr. Thompson encouraged the plaintiff to become more active (Tr. 24; *see* Tr. 362-63). On March 17, 2015, Dr. Thompson reported on a physician statement for DSS that the plaintiff's disability was not permanent,

---

[2] These regulations apply for applications, like the plaintiff's, filed before March 27, 2017. *See* 20 C.F.R. § 416.927. For applications filed on or after March 27, 2017, a new regulatory framework for considering and articulating the value of medical opinions has been established. *See id.* § 416.920c. *See also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (revisions to medical evidence rules dated Jan. 18, 2017, and effective Mar. 27, 2017).

but was expected to last six months. She was able to sit, push/pull, keyboard, or lift and carry for four hours per day, and she could stand, walk, climb stairs/ladders, knee/squat, or bend/stoop for two hours each per day (Tr. 402-05). The ALJ gave the opinion "partial weight," noting that the opinion was close in time to the CVA and that the opinion indicated that the plaintiff could actually do more than the RFC assessment provided (Tr. 25).

Next, on April 5, 2015, Dr. Thompson completed a physician report for family court in which he reported that the plaintiff was being treated for CVA, diabetes, peripheral vascular disease, and DVT.  He stated she was not able to work at her usual occupation as a server, he considered her to be partially and permanently disabled, and he reported she was unable to stand for long periods and had weakness and shortness of breath (Tr. 406). The ALJ noted that this opinion was within one year of the plaintiff's original CVA, which occurred in September 2014, and that the opinion did not indicate that the plaintiff could not work at any occupation.  The ALJ gave the opinion partial weight, finding that the medical evidence indicated problems with the plaintiff's lower extremities and that she required a sit/stand option every 30 minutes.  However, as the ALJ stated, a determination that a claimant is unable to work is not a medical opinion and is instead an administrative finding reserved to the Commissioner (Tr. 25). 20 C.F.R. § 416.927(d) (stating that an opinion that a claimant is disabled is not a medical opinion but is instead an opinion on an issue reserved to the Commissioner and that such a statement by a medical source does not mean that the SSA will determine that the claimant is disabled).

On November 3, 2015, Dr. Thompson noted that the plaintiff was capable physically of attending class to learn a new vocation that did not require standing or great physical effort, but her ability to do so was compromised by a lack of transportation. However, he also stated that the plaintiff was "currently fully disabled," but he hoped for improvement with cessation of smoking and compliance with all medications, which Dr. Thompson indicated was "a must for any hope of . . . quality of life" (Tr. 535-36). The ALJ

16

noted that Dr. Thompson's statements were inconsistent and demonstrated a lack of familiarity with SSA regulations and that his statement that the plaintiff was fully disabled was on an issue reserved for the Commissioner. Thus, the opinion was given little weight (Tr. 26).

On November 2, 2016, Dr. Thompson completed another DSS physician statement, this time indicating that the plaintiff's disability was permanent, and she was unable to work or participate in activities to prepare for work. He opined the plaintiff could sit, stand, and walk two hours each per day, but she needed to lay down often. Dr. Thompson indicated that the plaintiff "can't really sit to type" (Tr. 522-23). The ALJ also considered this opinion and found that it was entitled to "partial weight." Specifically, the ALJ noted that Dr. Thompson listed only the plaintiff's past CVA and diabetes as her current impairments, and he did not explain why the plaintiff needed to lay down often or could not sit and type (Tr. 25; see Tr. 522). The ALJ further observed that the longitudinal record did not support these restrictions – for example, her examination the day before this opinion indicated only the plaintiff's report of limitations and not Dr. Thompson's observations for them or a medical basis (Tr. 25; see Tr. 529). As the ALJ noted, at the plaintiff's November 1st examination, her range of motion was normal, her strength was only mildly compromised, sensations were normal in her feet, and she had normal muscle tone with some upper right extremity weakness (Tr. 25; see Tr. 530).

The ALJ also considered the plaintiff's neurological examination in January 2015 (Tr. 25; see also Tr. 23-24) in which Dr. Rojugbokan concluded that the plaintiff had no problems sitting, was able to stand for about ten to 15 minutes, and had difficulty lifting or carrying any object with the right hand (Tr. 342-45). As the ALJ noted, Dr. Rojugbokan's examination showed that the plaintiff walked with a slightly abnormal gait, tending to limp and favor the right leg; her grip was 4/5 on the right and 5/5 on the left, and her ability to use the hand and arm for fine and gross manipulation was normal; she was slightly ataxic,

but had no involuntary movement; sensation was decreased on the right, but intact on the left; she had normal reflexes and only slight muscular weakness in the right lower extremity of about 4/5, while it was 5/5 in the left lower extremity; she had difficulty tandem walking and had abnormal heel-to-shin performance on the right, but normal on the left; finger-to-nose was normal on the left, but only slightly diminished on the right; alternating hand motion was normal bilaterally; and she did not have any kind of assistive or ambulating device (Tr. 23; *see* Tr. 342-45). The ALJ considered the opinion and gave it partial weight. Specifically, the ALJ noted that Dr. Rojugbokan was a one-time examining source with knowledge of the SSA's regulations. The ALJ noted that the opinion was given within four months of the plaintiff's original CVA and that the plaintiff's doctor expected improvement with medical compliance (*see* Tr. 535-36). The ALJ further found the opinion to be consistent with the plaintiff's medical history and included bench work type jobs and a sit/stand option in the RFC assessment to accommodate the plaintiff's limitations (Tr. 25; *see* Tr. 22 (RFC assessment including limitations to alternate between sitting and standing every 30 minutes and utilizing both hands to handle objects greater than ten pounds)).

Finally, the ALJ gave partial weight to the opinions of the state agency physicians (Tr. 24; *see* Tr. 96-99, 109-112). The ALJ was required to consider the state agency medical consultants' assessments as opinion evidence as they "are highly qualified and experts in Social Security disability evaluation." *See* 20 C.F.R. § 416.913a(b). The ALJ found that the plaintiff had greater limitations than those found by the state agency medical consultants, noting that the medical record showed that the plaintiff had multiple strokes after her initial stroke in September 2014 (Tr. 24), which post-dated the state agency physicians' decisions (*see* Tr. 479-83). Accordingly, the ALJ provided a more limited RFC assessment than those opined by the state agency physicians (Tr. 22).

The undersigned finds that the ALJ sufficiently articulated her reasons for the weight given to the medical opinions, and the findings are based upon substantial evidence.

### Subjective Complaints

The plaintiff further argues that the ALJ erred in the analysis of her subjective complaints (doc. 16 at 12-14). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*. . . .
> ***
> It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original). In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d 559, 565 (4th Cir. 2006). However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id*. at 564 (quoting SSR 90-1p, 1990 WL 300812). The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to

> evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on" in evaluating the claimant's subjective symptoms. *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). In making these determinations, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10 (applicable

date Mar. 28, 2016).[3] The factors to be considered by an ALJ in evaluating the intensity, persistence, and limiting effects of an individual's symptoms include the following:

(1) the individual's daily activities;

(2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3) factors that precipitate and aggravate the symptoms;

(4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c).

Here, the ALJ thoroughly discussed the plaintiff's hearing testimony, including her identified limitations such as blurry vision, difficulty shopping on her own, difficulty standing up to prepare meals, difficulty writing, and fatigue, but found that while the plaintiff's medically determinable impairments could reasonably be expected to cause the

---

[3] Social Security Ruling 16-3p rescinded and superseded SSR 96-7p and became applicable on March 28, 2016. 2017 WL 5180304, at *13. Because this application was adjudicated after the date SSR 16-3p became applicable, the court has analyzed the plaintiff's allegations under that ruling. *Id.* at *13 n.27. The court observes that SSR 16-3p discontinues use of the term "credibility," but "'the methodology required by both SSR 16-3p and SSR 96-7, are quite similar. Under either, the ALJ is required to consider [the claimant's] report of his own symptoms against the backdrop of the entire case record.'" *Best v. Berryhill*, C.A. No. 0:15-cv-02990-DCN, 2017 WL 835350, at *4 n.3 (Mar. 3, 2017) (alteration in original) (quoting *Sullivan v. Colvin*, C.A. No. 7:15-cv-504, 2017 WL 473925, at *3 (W.D. Va. Feb. 3, 2017)). *See also Keaton v. Colvin*, C.A. No. 3:15-cv-588, 2017 WL 875477, at *6 (E.D. Va. Mar. 3, 2017) ("Effective as of March 28, 2016, SSR 16-3p superseded SSR 96-7p. SSR 16-3p effectively removes the use of the term 'credibility' but does not alter the substantive analysis.").

alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record (Tr. 22-23). First, the ALJ noted evidence that the plaintiff "had not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application" (Tr. 23). In January 2015, Dr. Thompson noted the plaintiff was "not taking Xarelto" (Tr. 356). The ALJ cited treatment notes from October 2015 indicating the plaintiff was taking Xarelto "every other day or so" and hospital records from October 2016 noting the plaintiff had "ongoing strokes since her last admission despite reportedly being on Xarelto" (Tr. 23; *see* Tr. 482, 538).

In addition, the ALJ cited evidence that the plaintiff's "uncontrolled hypertension and diabetes may play a role in her stroke history, and the evidence indicates medical noncompliance with medication for those conditions as well" (Tr. 23) (citing Tr. 414-520, 524-90). In January 2015, Dr. Thompson noted that the plaintiff's lack of exercise, smoking, and medication non-compliance aggravated her hypertension (Tr. 356-58). The ALJ noted that treatment notes from September 2015 indicated good response to hypertension medications, but subsequent treatment records in October 2016 showed that the plaintiff's hypertension and diabetes were uncontrolled, and she had been counseled "multiple times" regarding medication compliance and smoking cessation (Tr. 532, 543). The ALJ also noted that the while the plaintiff was encouraged to become more active with regard to her DVT and blood clots in the legs, the plaintiff testified that she sat in bed all day and did very little (Tr. 23) (citing Tr. 67-68, 359). *See* SSR 16-3p, 2017 WL 5180304, at *9 ("[I]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.").

In evaluating the plaintiff's subjective complaints, the ALJ also considered the neurological examination findings from January 2015 showing that, although the plaintiff walked with a slightly antalgic gait, tending to limp and favor the right leg, her grip strength was 4/5 on the right and 5/5 on the left, and she had slight muscle weakness in the right lower extremity, but 5/5 strength in the left lower extremity (Tr. 23-24; *see* Tr. 344). Also, in November 2016, Dr. Thompson observed the plaintiff had normal musculoskeletal range of motion; normal sensation in her feet; normal strength; normal finger-to-nose testing; and some right upper extremity weakness (Tr. 23-24; *see* Tr. 529-30).

The ALJ also noted her own observation at the hearing that the plaintiff was able to ambulate without tripping or falling around the table, equipment, and chairs. The ALJ emphasized that this was only one of many considerations in her analysis of the plaintiff's subjective complaints (Tr. 24). *See Massey v. Astrue*, C.A. No. 3:10-2943-TMC, 2012 WL 909617, at *4 (D.S.C. Mar. 16, 2012) ("As to the sit and squirm observations, the ALJ may not solely base a credibility determination on his observations at a hearing; however, the ALJ may include these observations in his credibility determination.") (citations omitted); SSR 16-3p, 2017 WL 5180304, at *7 ("The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file.").

Based upon the foregoing, the plaintiff has failed to demonstrate that the ALJ's evaluation of her subjective complaints is unsupported by substantial evidence or controlled by an error of law.

## CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

August 28, 2019
Greenville, South Carolina

**The attention of the parties is directed to the important notice on the following page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

Greenville, South Carolina